## MARYLAND CASUALTY CO. v. DAWSON.
### No. 7497.

Circuit Court of Appeals, Fifth Circuit.

Feb. 20, 1935.

Rollin W. Rodgers, of Texarkana, Tex., for appellant.

William V. Brown, of Texarkana, Tex., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

Appellee filed suit in a state court against appellant as insurer under a policy of workmen's compensation insurance, issued to the National Lumber & Creosoting Company of Texarkana, to set aside an award of the Industrial Accident Board of Texas on a claim for compensation, arising from the death of her husband, Will Dawson. The cause was removed to the federal court by appellant, was tried to a jury, and resulted in a verdict for appellee, upon which judgment was entered awarding her compensation at the rate of $11.75 per week for a total period of 360 weeks. Error is assigned to the overruling of a motion for a directed verdict in favor of defendant, to the denial of a new trial, and to the overruling of a motion for judgment non obstante veredicto. This last assignment has been abandoned. No other errors are assigned.

It is not disputed that the amount awarded is correct, if plaintiff was entitled to recover, but appellant contends that Will Dawson was not injured in the course of his employment and died from natural causes; and that appellee failed to sustain the burden of proving she was entitled to compensation.

It is conclusively shown that Will Dawson had been working for the creosoting company for more than 20 years, was a good careful worker, and prior to his last illness was a strong healthy man. He was a regular member of a gang consisting of four laborers whose duty it was to handle cross-ties and to load them from tramcars into railroad cars. Dawson and his colaborers were negroes. The creosoted ties weighed from 160 to 170 pounds. He died June 1, 1930. Except as to this, there was sharp conflict in the evidence. The theory of plaintiff was that the accident occurred on Thursday, May 22, 1930. The theory of defendant was that no accident occurred at all and the last day Will Dawson worked before his death was on Friday, May 16th. The case was tried in January, 1934.

As the case presents a close question of fact, the material evidence may be somewhat briefly stated. In substance, it was this: Fannie Dawson, appellee, testified that her husband went to work on May 22d and was in good health; that he came home in the afternoon and told her he was about half dead and his head and back hurt and he complained of much pain; that she took him into the house and found marks on his back and head; that she called one of her neighbors and got some liniment and rubbed him the best she could and did not call a doctor until May 27th, when she called Dr. Thompson, a negro; that Dawson was then almost unconscious; that she also called Dr. Matthews and Dr. Smith to attend her husband; that she was asked by Howard, the plant superintendent, to allow a post mortem, consented, and delayed the funeral a day for that purpose. Dr. Matthews testified he was a chiropractor; that his medical studies embraced all branches except materia medica and surgery; that he had been practicing 24 years in Texarkana; that he was called to see Will Dawson one time, in May, 1930, but he could not fix the date; that he found him in severe pain and thought he was in a dying condition; that Dawson died the next morning; that he went over his lungs with a stethoscope and found heavy congestion and his breathing was labored and heavy; that he examined his spine and found heavy congestion near the kidney nerve, around the tenth dorsal vertebra, which is above the belt line, just below the points of the shoulder blades; that after going down the spine it looked to him like there had been possibly an injury to the spine and he found a malalignment of the spinal column. He also said Dawson's condition could have been caused from disease.

Charlie Davis testified that he lived at the plant, had worked for the creosote company for 8 or 9 years, first as an extra man until Dawson's death, when he succeeded him as a regular; that he had known Dawson for 3 or 4 years and worked with him on the last day he was there, loading creosote ties into a railroad car from a tram; that Dawson was carrying the ties into the car; that there was a little accident; that Dawson let a tie fall on him, "as he went to heave the tie he throwed it in one place and it fell in another place"; that the tie hit him about the belt line. Except for the testimony of Cal Ferguson, which was immaterial, this was all the evidence offered by plaintiff.

Defendant offered the following evidence: Dr. Smith testified that he was called to see Dawson, but did not recall the dates. He made three or four visits but they were in the last day or two of May. When he first visited him, he was a very sick man, unconscious, and unable to answer coherently when he tried to arouse him, and he gave no detailed history of his illness; that he had bronchial pneumonia and a urinalysis disclosed that he had inflammation of the kidneys or Bright's disease; that it was hard to say what was the exact cause of his death, he had so many things, any one of which might have killed him, either bronchial pneumonia or Bright's disease was sufficient, and he attributed his unconsciousness to cerebral hemorrhage; that he found no evidence of traumatic injury; that he examined Dawson's spine but could not have told whether any of the vertebræ were out of line without an X-ray. Dr. Smith gave a certificate of death from cerebral apoplexy, which said contributing cause was "usual." He also testified that an injury could produce a cerebral hemorrhage and pneumonia and in a great many instances that is what does produce them. Dr. Thompson testified that the first visit he made to Dawson was on May 18th and he was complaining of pains over his body and he had some slight bronchial trouble and cold and he called it grippe; that he was told that Dawson had been sick about 2 or 3 days; that he made another visit on the 21st and his condition was the same. He had no records. On cross-examination he was shown a memorandum he had made in October, 1930, in which he stated that he visited Dawson on the 24th of May. Harland, the clerk who kept the time sheets of the laborers, which were made up weekly, testified that the last day Dawson worked was Friday, May 16th. However, the records were not produced, and he could not say accurately who worked in the gang with Dawson. He further stated Fannie Dawson came to see him after her husband died, expressed the opinion he had been hurt, and asked if the company would bury him. Cat. Harris, B. D. Curry, and Charlie Wright testified they worked in the same gang with Dawson on the last day he worked; that they did not see any accident and Dawson made no complaint of having been hurt; that they were loading ties from the tramcar into the railroad car; that Davis was not in the gang; that Curry and Wright were lifting ties onto the shoulders of Daw-

son and Harris. The testimony of these witnesses was indefinite as to the date of the last day Dawson worked. Harris further testified that after Dawson got down in bed he went to see him the next day and Dawson told him he got a lick in his right side while he was working out there; said a tie hit him in the side and he was not able to talk any more that it was hurting him so bad. Howard, the plant superintendent, testified that the last day Dawson worked was Friday, May 16th; that he was a tie carrier and was paid by the piece; that it was a rule of the plant that if an employee was hurt it should be reported to the foreman and the first aid man; that no report was made as to Will Dawson; that Will was a good safe worker, had been there a long time and knew the rules; that he had a habit of not wanting to work on Saturdays and came to him on Saturday, the 17th, and said he was feeling sick and did not want to work and he was excused for that day; that after Dawson died he had some talk with his wife about a post mortem and talked to Dr. Smith about it; that he made no special request for a post mortem and after he talked to Dr. Smith did not think it was necessary. Mead, secretary and treasurer of the creosoting company, testified that on May 31st Fannie Dawson came to his office and asked for an advance of $15 on her husband's wages, saying they had no money to buy food or medicine and she was advanced $15; that she did not say anything about her husband being hurt at the plant and told him that Dawson had told her that he had not been hurt and there was no claim against the company for insurance at all; that the creosote company paid $50 towards Dawson's funeral expenses; that it was not unusual to advance money and pay funeral expenses for old employees. This was all the material testimony.

█ We think there was sufficient evidence before the jury with the reasonable inferences that might be drawn from it to show that Will Dawson suffered an injury in the course of his employment, which ultimately resulted in his death. After four years, witnesses could hardly be expected to remember accurately details of occurrences in which they were not specially interested at the time.

It was for the jury to determine the credibility of the witnesses, the weight and sufficiency of the evidence, to resolve the conflict in the testimony, and to draw rea-

sonable inferences from it. It was not error to deny the motion for verdict.

Appellant moved for a new trial and one of the grounds urged was that the verdict was based on false testimony of the plaintiff, Fannie Dawson, Charlie Davis, and Cat Harris. Attached to the motion was an affidavit of Charlie Davis and a transcript of testimony given by Cat Harris and Fannie Dawson on the trial of a suit to recover on an accident insurance policy. There is no material difference between the testimony of Fannie Dawson in the two suits and the only difference in the testimony of Cat Harris is that he did not testify in the first suit as to what Dawson told him about his injury. Cat Harris was cross-examined as to his testimony in the first suit and as to his affidavit filed before the Industrial Accident Board and in explanation said he was scared and just did not bring it up and reaffirmed that Dawson had told him the words he had repeated. This feature did not show newly discovered evidence. The affidavit of Charlie Davis is substantially this. He had never seen or heard of an accident occurring to Will Dawson and was induced to give the testimony by Cat Harris; that he went to the office of Mr. Brown, attorney for Fannie Dawson, and told him so; that Brown wrote up something for his statement, but he was not asked to sign it and did not sign it.

In reply to the motion for a new trial, plaintiff alleged that Davis had been intimidated to induce him to change his testimony and filed an affidavit of Davis made on September 22, 1931, and also an affidavit made by Ernest Taylor, apparently not available as a witness, at the same time. Davis' affidavit is substantially the same as the testimony he subsequently gave and Taylor's affidavit corroborates it fully; Davis' affidavit was signed with his mark. Mr. Brown filed his own affidavit to the effect that Davis had made the statement freely, voluntarily, had said he could not sign, and touched the pen when he made his mark. Brown's affidavit was supported by the affidavit of Flora Hart, notary, who took the affidavits of Davis and Taylor.

█ It is well settled that in federal courts, regardless of state practice, the granting or refusing of a motion for a new trial is within the sound discretion of the trial judge and error may not be predicated thereon, unless the judge has declined to consider the motion at all or to consider evi-

dence offered in support of it. Fairmount Glass Works v. Cub Fork Coal Co., 287 U. S. 474, 475, 53 S. Ct. 252, 77 L. Ed. 439. Appellant was allowed 40 days in which to file the motion for new trial. After it was filed and plaintiff replied, appellant was allowed to amend his motion and file additional affidavits in rebuttal. The court then allowed ample time for argument and consideration of the motion. It is apparent that the judge gave appellant ample opportunity to present the motion and support it by evidence and carefully considered it before denying it. We find no abuse of discretion.

The record presents no reversible error. Affirmed.