## GILLETTE SAFETY RAZOR CO. v. TRIANGLE MECHANICAL LABORATORIES CORPORATION.

### No. 144.

Circuit Court of Appeals, Second Circuit.

Feb. 1, 1937.

Morris Kirschstein, of New York City, for appellant.

Henry R. Ashton and William J. Barnes, both of New York City, for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree holding valid and infringed claims 1, 3, 4, 5, 8 and 11 of Patent No. 1,948,192, for a method of putting a blue finish upon razor blades as a substitute for blue lacquer. The plaintiff has spent four millions in advertising this color throughout the country and others apparently wished to trade upon the goodwill so created. The patent is primarily intended to fend them off, but the invention also avoids one step in manufacture—polishing—which during the course of a year in the plaintiff's enormous business saves a not inconsiderable sum, though bright polished blades still sell alongside the blue. Stargardter, the inventor, an employee

700

of the plaintiff, filed his application on March 10, 1932. He chose an apparatus already disclosed in a patent granted to Salzman on October 22, 1929, No. 1,732,244, for hardening and tempering razor blades. In this a roll of unhardened steel of proper thickness and width, stamped as a line of blades, was run through a hardening chamber, where it was kept above the necessary critical limit, 1400° F., whence it ran between chilling blocks, "immediately adjacent the delivery opening" (page 2, lines 26, 27); thereafter it passed through a tempering chamber, where it was heated again but to a less degree; and finally it passed through second chilling blocks. As Salzman wished to get a bright blade he tried to avoid oxidizing it; "heating and chilling of the strip 10 are effected without oxidization thereof" (page 2, lines 77–79); the method was "intended to conserve the advantage of the older type of heat treatment in respect of preventing oxidization" (page 1, lines 60–62). Stargardter changed the process so disclosed only by producing, not a bright blade, but a blue, and to do this he introduced into the hardening chamber a controlled quantity of air. The art had long known the effect of oxygen upon heated steel; if ordinary atmosphere is given access to it, it will turn out covered with a black scale. It had been customary, therefore, to introduce into the hardening chamber a mixture of illuminating gas and insufficient air to burn it. After combustion the constituents were steam, hydrogen, carbon dioxide, carbon monoxide, and nitrogen; an atmosphere made up of two groups of opposed substances. The steam and the carbon dioxide tend to oxidize the steel; the hydrogen and the carbon monoxide to counteract them. Stargardter proposed to keep a proper balance between the two in the hardening chamber and to chill the strip immediately on its emerging, so as to avoid exposing it to the air while still heated. He did not claim the discovery of the reaction of illuminating gas and air in the chamber; "ordinary illuminating gas, which, as is well known, is reducing in its effect, diluted with air has been found entirely satisfactory in practice. The addition of atmospheric oxygen to the reducing illuminating gas results in a mixture which is no longer reducing but slightly oxidizing in its effect at the temperature used." (Page 2, lines 30–36.) Nor did he make any effort to disclose the proportions between the two gases; by "adjusting the mixture the tint of the blued finish may be varied and made lighter or darker." (Page 2, lines 41–42.) All the claims in suit except the first describe the hardening atmosphere only as having an "oxidizing effect less than that of atmospheric oxygen," for which claim one substitutes "a gaseous mixture having a reducing constituent but being oxidizing in its effect." Thus the patent left the result to be determined empirically; and while this did not make the disclosure inadequate, it may, and does, have an important effect upon the issue of novelty.

As we have said, the art had long known the effect of oxygen upon heated steel. Steel is annealed at much lower temperatures than are necessary to harden it, but it will blacken none the less if air is admitted in the process, and as far back as 1862 Washburn, Patent No. 36,628, disclosed a method for annealing without oxidizing. This was to be done in an atmosphere of "carbonic oxide or nitrogen or any other substance or gas which shall not give up to the iron of which the wire is composed any or very little oxygen." Already he had provided for bluing the metal: "When such wire is being annealed some atmospheric air may be introduced into the pot; but it must be in such regulated quantities as that it shall only 'blue' the metal, but not oxidize it." The oxygen or air must be "only sufficient to blue without oxidizing the wire." This was in substance repeated in Wells' patent, No. 382,447, of 1888, for coating iron and steel with rustless oxide by introducing into the chamber a mixture of steam and carbon monoxide, the steam being the oxidizer and the carbon monoxide the reducer. True, Wells was not after a blue color, and perhaps did not know that he could get it; he wished to cover the surface of the iron or steel with a coating of black or magnetic oxide. Nevertheless, he understood the balancing of the two agents which he introduced. At the end of 1924 Alexander & Imbery filed their applications in England and here which resulted in their patent, No. 1,626,713, issued on May 3, 1927. This was for a process of hardening and tempering a steel wire or strip like Salzman's and Stargardter's. Inside the hardening chamber there is to be "practically a neutral atmosphere, obtained by burning out the oxygen content of the air in the tube by the heat of the wire. This enables bright wire to be obtained. * * * Provision may be made for admitting inert gas such for example as hydrogen into the tube, C, to clean the wire when heated. * * * If it be desired to obtain black or coloured wire this

can be effected by admitting air or other oxidizing influence to the traveling wire by means of the valves $c^8$, $c^9$, and adjusting the current input for the temperature required." (Page 1, lines 86–110.) Possibly this was indeed not a complete anticipation of all the claims because the steel was not "blued"; yet it will have been already noticed that the apparatus could be used to "colour," as well as to blacken, and the "colour" produced would be blue. The plaintiff says that for several reasons the method would not produce Stargardter's results; the strip would be unevenly colored; hydrogen is not an "inert" gas; oil chilling would discolor a strip of razors. We accept as true that the blades would be unevenly heated when used as an electric resistance, as Alexander & Imbery disclosed; and that oil chilling would discolor them. But all specifications are addressed to the art and presuppose reasonable intelligence and good faith; it is incredible that these difficulties should have withstood trial. To call hydrogen "inert" was a harmless mistake for it was a reducing agent, but it is not quite so clear that it was to be used as such. The passage just quoted shows that the primary purpose was to get a bright steel by exhausting the oxygen of the chamber; hydrogen was primarily to be used only to "cleanse" the metal. However, it was admitted through one of the two valves $c^8$ and $c^9$, and the air or other oxygen was also admitted through one of them. It is a strong inference that they were to be used together, else there would appear to have been no reason for two. If so, the whole invention was here. If not, Fahrenwald, Patent No. 1,787,977, and Hayes, Patent No. 1,808,721, soon supplied whatever was lacking, though their use of it was different, Fahrenwald's "limitedly oxidizing atmosphere is produced by burning a hydrocarbon fuel in a deficiency of oxygen so as to produce a mixture of $H_2O$, $CO$, and a small amount of $CO_2$, together, of course, with N, and sometimes with some free hydrogen or some free carbon or some free hydrogen and carbon." (Page 1, lines 84–90.) The purpose was to form a "protective coating" and the heat was to be above the "critical range." "The sheet when completed exhibits a silky, glossy sheen, often showing iridescent colors when hot but nearly black when cold." (Page 2, lines 29–31.) Hayes disclosed that while being hardened "steels normally require an inert or nonreäctive atmosphere, in order to eliminate oxidation and the resultant scale and

pitting; high speed steels, however, may be hardened by a heat treatment in an atmosphere containing a slight, definite, excess of carbon monoxide" (page 1, lines 47–53). Varying the proportions of the air and gas regulates the "atmospheric conditions within the furnace so as to produce different desired effects upon the work being treated." (Page 2, lines 38–40.) Hayes did not indeed say what the different desired effects might be, but they would be of color as Alexander & Imbery had indicated. Finally, the art knew well that with soft steels a blue iridescent sheen could be procured by means of such an atmosphere.

This was the equipment of the art when in July 1931, the plaintiff decided upon blue for some of its blades after experimenting with other colors. So far as appears, nobody had ever before wanted to color a razor blade blue; the need came into existence at that moment, and there is not, and of course could not be, a syllable that its satisfaction had called forth any earlier efforts from steel makers. The best that can be said for the patent is either that it took some invention to think of coloring blades blue at all, which nobody has the hardihood to assert; or that the delay of seven months while lacquer was being used shows that the art did not have the immediate answer. But, so far as appears, lacquer may have been better over a short experimental period; we are not told when it was found desirable to change; it by no means follows that had the patented method been at hand in July, it would have been at once used before the plaintiff could learn whether the new color would be successful. Moreover, there is testimony that the defendant itself devised the process independently; its witnesses said so. The district judge did not disbelieve them, although the plaintiff thinks that he did. The passage of his opinion relied upon is that in which he was discussing an assertion of Nadeau, the defendant's secretary and treasurer, that the defendant had abandoned the use of gas in the heating chamber in September or October of 1935, and had never used it again. The judge did find for the plaintiff on that; but that is all. All these considerations make the feeblest of settings for the invention; not enough, it seems to us, to take it from among those step by step advances by which every art progresses without the aid of outstanding ability. As soon as it became desired to color a razor blade blue, the knowledge and the method lay immediately at hand; all one needed was to inject into

702

Salzman's furnace an atmosphere which had been used again and again. It is of no consequence that the product of that atmosphere had in the past been either bright or black; that was all the art had wanted; when it wanted blue, it had the means to get it. Nothing was needed but the competence of a duly certified Ph. D., surely not a test of invention. The claims are in our judgment invalid.

We have disposed of the appeal without recourse to any of the new evidence presented upon the defendant's motion for a new trial; we have no jurisdiction over the appeal from the order denying it. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439; Goldstein v. U. S., 73 F.(2d) 804, 807 (C.C.A.9); Prudential Ins. Co. v. Murphy, 74 F.(2d) 544 (C.C.A.7); Maryland Casualty Co. v. Dawson, 75 F.(2d) 431, 433 (C.C.A.5). The lesson appears to be a hard one for the bar to learn, perhaps because there has always hung about the rule an aura of not too certainly defined exceptions. Of course the judge may refuse to consider the motion at all, or his consideration may be on its face a mere fetch, a transparent pretence; then we may entertain the appeal. But when as here he has actually considered it, that is all that the beaten party can ask; he has had his day, and appeals are not always as of right.

Decree reversed; bill dismissed for invalidity.